# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| KIMBERLEY S. EPPES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CV-458 |
| | ) | (Phillips/Guyton) |
| ENTERPRISE RENT-A-CAR COMPANY | ) | |
| OF TENNESSEE d/b/a ENTERPRISE | ) | |
| RENT-A-CAR, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [Doc. 78] with respect to plaintiff's remaining claims based on unlawful retaliation under Title VII, 42 U.S.C. § 2000(e), *et seq.* ("Title VII"), the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.* ("THRA"), the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 ("TPPA"), and Tennessee common law. The individual defendants also request summary judgment as to plaintiff's claims based on retaliation for aiding and abetting unlawful activity under the THRA, Tenn. Code Ann. § 4-21-301. The plaintiff has responded in opposition, and the defendants have replied. For the reasons that follow, defendants' motion for summary judgment [Doc. 78] is **DENIED in its entirety.**

1

With respect to the motion for summary judgment, the plaintiff filed a motion to strike part of defendants' reply to plaintiff's response to defendants' motion for summary judgment [Doc. 109] and a motion for clarification of the Court's scheduling order regarding summary judgment and, if deemed appropriate, for ancillary relief [Doc. 110]. These motions [Docs. 109 and 110] are **DENIED as moot**.

## I.     Summary of the Facts

As the law requires, all disputed facts and inferences are resolved most favorably for the plaintiff. The Court merely provides an abridged summary of facts for the purposes of this opinion.

Plaintiff Kimberly S. Eppes ("Eppes") began employment for defendant Enterprise Rent-A-Car Company of Tennessee d/b/a Enterprise Rent-A-Car ("Enterprise") on July 2, 2003 as a management trainee. In general, plaintiff asserts that during the time of her employment she received numerous awards, accolades, a promotion, and promises of future promotion. However, after complaining up the chain of command regarding instances of sexual harassment, she believes that Enterprise deemed her a pariah and decided to terminate her employment with the company.

Defendants assert that several instances of "bad conduct" warranted plaintiff's dismissal. The first incident occurred on the premises of Grayson Pontiac. After plaintiff asked to use Grayson's telephone, plaintiff engaged in a heated telephone conversation with her landlord regarding the lease. Grayson reported the incident to plaintiff's manager and stated that they did not want plaintiff on their premises. Another incident involved a verbal telephone argument between plaintiff and the assistant branch manager Brittany Harris ("Harris"), who was also her then roommate, regarding a scheduling conflict. In her defense, plaintiff states that she had difficulty in separating her personal relationship with Harris from their professional relationship and that the telephone conversation was "off-the-clock." Regardless, Crystine Galvan ("Galvon"), the East Tennessee Human Resource manager for Enterprise, looked into the situation and spoke with plaintiff about improving her anger management skills. Galvan gave plaintiff information regarding the Enterprise Employee Assistance Program ("EAP").

Defendants also describe an incident that took place at an Enterprise Christmas party. A guest at the party claimed that she was assaulted and subsequently filed a criminal compliant against an "unknown suspect." Galvan conducted an investigation, and although Galvan feels that plaintiff was involved in the assault, no disciplinary action was issued. Galvan's handwritten notes indicate that plaintiff was pushed from behind into the guest in the elevator, who physically attacked plaintiff in response. Plaintiff was kicked in the face, receiving a black eye and a bloody nose. In fact, Galvan indicated in her notes that plaintiff herself should

go to the police.

Another incident, pin-pointed by the defendant, involved an angry customer who was five hours late to pick up a rental car. Apparently, his reserved car was rented to another customer when he failed to timely pick up the vehicle. The customer yelled and slammed his fist on the counter. Plaintiff states that she was afraid of the customer. Plaintiff asked the customer to step away from the counter. Although defendants assert that the plaintiff is to blame for the situation escalating out of control, the plaintiff states that she asked for assistance from a manager, who said that she was busy doing the schedule and did not want to be bothered to assist the plaintiff. After the situation escalated, the plaintiff did receive help.

As culmination of the above instances, plaintiff was issued a written warning on March 3, 2004. Plaintiff was warned that "any future incidents of insubordination, failing to put our customers first or displaying further anger management issues with customers, employees or referral sources may result in disciplinary action, up to and including termination." Around the same time, plaintiff was involved in an altercation with fellow employee and roommate Harris, in which Harris sought a restraining order against the plaintiff. However, Enterprise did not take any action against plaintiff. Defendants asserts that the matter between the employees was a personal matter.

Thereafter, plaintiff was promoted to the position of assistant branch manager

and transferred to the Greenville, Tennessee office on June 7, 2004. The promotion and increase in wage occurred approximately sixty (60) days after the written warning was issued to plaintiff. In that respect, plaintiff had received four raises during her fifteen (15) months of employment. Cliff Frana ("Frana") became her branch manager around August 24, 2004. At Greenville, a management trainee Sirrena Wiggins ("Wiggins") complained to area manager Marty Stapleton ("Stapleton") of plaintiff's behavior. Stapleton was Frana's supervisor. Plaintiff dismisses Wiggins complaints asserting that Wiggins was threatened by her promotion to Greenville and, as a result, was hostile and resentful toward her.

Around early September 2004, plaintiff complained to Stapleton that she was being subjected to sexual harassment and hostile work environment caused by defendant Daren Lowe ("Lowe"). According to plaintiff, Stapleton and the regional rental manager Tony Halas ("Halas"), who is Stapleton's supervisor, told Frana to start documenting all instances of misconduct by plaintiff. Plaintiff states that Lowe was merely advised that he needed to do a better job in working with the plaintiff. Lowe followed up in communication to Stapleton thereafter to report that plaintiff was still "not happy" with him.

Dissatisfied with Stapleton's inaction to remedy the situation, on September 20, 2004, plaintiff sent an e-mail to Halas stating that Lowe was retaliating against

her after she declined his request for a date.[1]   On September 22, 2004, when plaintiff was at Enterprise's administrative offices in Knoxville, Halas asked to speak with her privately.   During their conversation on September 22, 2004, plaintiff told Halas that Lowe had been trying to date her and that he had been treating her in a hostile manner since she refused.   The plaintiff detailed examples of what she felt was inappropriate behavior by Lowe, such as taking cars belonging to the Greenville branch, making derogatory comments about her to Frana, starting rumors of a sexual nature about her (such as having sex with a customer in exchange for a cell phone), and generally "making her life hell."   Plaintiff also complained about other matters, including Frana's behavior.   During the conversation, plaintiff stated that she "want[ed] it to be resolved, [that she] just want[ed] it to go away. [She wanted her] career back on track."   Plaintiff requested a meeting to remedy the situation and wanted Lowe to be present.

Halas then contacted his supervisor, vice president Neil Hafer ("Hafer"). Halas and Hafer decided to handle the situation without the help of Human Resources.   However, defendants assert that Human Resources was contacted. The meeting was scheduled for September 29, 2004.

When plaintiff was away from the office attending training on September 22,

---

[1]This e-mail, or MS01, is the only e-mail that defendants cannot locate.  It is a written record of plaintiff's protected activity created by the plaintiff.  Furthermore, there is a second missing piece of written evidence, the plaintiff's journal.  The journal was located at plaintiff's desk on the day of her dismissal. Plaintiff asserts that Stapleton arrived at plaintiff's office first, after firing plaintiff in Knoxville, and her journal has never been seen again.

2004, an audit occurred in the Greenville office. Defendants prepared disciplinary documentation against the plaintiff for errors that were found during the audit. In comparison, Frana, the plaintiff's branch manager, never received any written documentation of discipline for his responsibility of the errors that were allegedly found at the Greenville office that day.

Amidst these communications and happenings, on September 21, 2004, plaintiff called Luke Edwards ("Edwards"), an employee of Lawson's Body Shop ("Lawson's"), to find out how long a customer had been waiting at his shop. According to the plaintiff, plaintiff initiated the call when a lady arrived at Enterprise distressed at having to wait too long at the body shop. Plaintiff's telephone inquiry was met with hostility by Edwards. Edwards called her a "-itch" and treated plaintiff with anger and rudeness. Plaintiff ended the conversation when she felt that it had concluded. Plaintiff states that she reported the event to her supervisor Frana, who remarked that Edwards was a "redneck a-hole," told her not to worry about it, and stated that he wold take care of it upon his return from a trip. Plaintiff then brushed off the event and was not aware that the incident would cause any concerns. However, defendants assert a different story, that is, Edwards called Enterprise and asked when an Enterprise representative would be picking up one of his customers. Plaintiff allegedly responded in hostility, raised her voice, used a nasty tone with Edwards, and behaved in an unprofessional manner. As a result, Edwards represented that he would not send business to Enterprise unless plaintiff was dismissed from employment.

Defendants assert that its transactions with Lawson's comprises important repeat business. Plaintiff articulates that Lawson's had rented approximately 13 cars over the four month period that she worked at the Greenville location. During that time, plaintiff asserts that Enterprise had experienced repeated problems with obtaining payment from Lawson's. Moreover, prior to any incident with plaintiff, Edwards had previously threatened Frana and another previous manager at the Greenville location that he was planning to use another car rental company, never actually doing so. Although disputed by defendants, plaintiff asserts that Lawson's continued sending referrals to the Greenville office during the intervening period between the incident on September 21, 2004 and plaintiff's termination on October 1, 2004.

Edwards did complain to the Tennessee Farm Bureau ("Farm Bureau"). The Farm Bureau advised another employee at Enterprise of the incident, who relayed Edward's complaint to Stapleton and Halas. Plaintiff points out that the Enterprise employee stated that "we handled the situation."

When Frana returned from his trip, he investigated the matter involving Edwards and the plaintiff. After he was asked to document misconduct of plaintiff, he sent an e-mail to Stapleton and Halas on September 29, 2004 (the date of the meeting with plaintiff) that Edwards claimed that he would not send any more business to Enterprise. Also, Stapleton spoke with a Edwards and a representative of the Farm Bureau about the incident. Plaintiff submits that this activity is part of

8

Enterprise's original plan to create documentation of misconduct after plaintiff complained of sexual harassment and a hostile work environment.

Defendants decided that two meeting should occur on the 29th of September, namely, a meeting regarding plaintiff's complaints about Lowe and a meeting with respect to "performance issues." Although plaintiff was asked to arrive early, she was not told by the defendants that any "performance issues" would be discussed. Accordingly, when plaintiff arrived for the meeting, she was faced, without warning, with defendants' contentions regarding poor performance on her part and issues of misconduct, including the incident with Edwards. Nevertheless, after such discussion, plaintiff alleges that she was told by Halas that she was on track for promotion; he had always felt she was a stellar employee; Enterprise was going to transfer her; and that demotion was out of the question. At the close of the meeting, Halas told plaintiff that he would get back to her with information regarding the transfer. Defendants then announced that they would take up plaintiff's issues regarding her complaints of sexual harassment, hostile work environment, and retaliation after a five minute break. At that point, plaintiff states that she had just been intimidated after being reprimanded and informed that she was being transferred. Plaintiff indicates that it was difficult for her to proceed to discuss any complaints that she had.

For the "second meeting," plaintiff states that when Lowe joined the group, he was enthusiastically greeted by Stapleton and Halas. Plaintiff was then asked

to speak first. Plaintiff proceeded to tell Stapleton, Halas, and Lowe that Lowe had approached her about having a personal relationship and that she had declined his sexual advances on several occasions, resulting in retaliation. Plaintiff then stated that Lowe was behaving unprofessionally, that on one occasion he had "stolen" a car she felt belonged to the Greenville branch, that he was starting rumors of a sexual nature about her, that Lowe was calling her names and insulting her behind her back to Frana, and that he was generally "making her life hell." Plaintiff also told Stapleton and Halas that Lowe called her a "stupid -itch" and told Frana that he wished plaintiff was not around. Plaintiff also told Stapleton and Halas that Lowe had called plaintiff a "whore" and a "slut," when speaking to Frana. Lowe denied all of the allegations except the diversion of the car to his branch. Lowe then characterized Eppes' complaints as "teamwork" issues. According to plaintiff, since she had just been reprimanded for five or six alleged shortcomings and was told that she was being transferred, she was afraid to say anything more and agreed with Halas to work through "teamwork" issues.[2]

The next day, on September 30, 2004, defendants decided that plaintiff should be dismissed from employment, rather than transferred. Halas and Stapleton were both decision makers with respect to plaintiff's termination. Plaintiff

---

[2]Also, plaintiff points out in the record that Stapleton agreed with plaintiff that Lowe's deliberate rudeness toward her was wrong, but Stapleton did not consider it significant enough to document against Lowe in a Significant Event Log. Stapleton does not recall why he chose to create an unsigned Significant Event Log about Eppes' alleged rudeness toward Wiggins, yet approximately two (2) weeks later chose not to document Lowe's deliberate rudeness to Eppes. Lowe and plaintiff both worked for branches supervised by Stapleton.

asserts that the change was a result of her complaints of sexual harassment, hostile work environment, and retaliation. However, according to defendants, Galvan, who was out on maternity leave at that time, allegedly stopped by the office and when advised of the situation with plaintiff's performance problems, expressed concern that, based on plaintiff's history of anger management issues, she was likely to have the same problems in the future. Defendants claim that at the time Galvan made this recommendation, she was not aware that plaintiff had made a complaint about Lowe, or that there had been a meeting the previous day to discuss plaintiff's complaint about Lowe.

According to the plaintiff, defendants added Galvan's recommendation for termination well after the dispute arose. In support, plaintiff avers that at the unemployment hearing, where Enterprise was not represented by legal counsel, Halas, Cheryl Bowman ("Bowman"), and Stapleton all testified under oath that no Human Resource person other than Bowman ("Bowman") was involved in the decision-making process to terminate plaintiff. In fact, Bowman was specifically asked why Galvan was not at the unemployment hearing, to which Bowman answered, "She was on maternity leave at the time of Ms. Eppes' termination." Further, Bowman was asked, "Who was involved in the decision to termination Ms. Eppes?", to which she replied, "Marty [Stapleton], Tony Halas, myself and Neal Hafer [Hafer], who's our regional vice president." Plaintiff states that, subsequently, in their depositions, Halas and Bowman both changed their testimony as to who was included in the decision-making group regarding plaintiff's termination to include

Karen Baker ("Baker") and Galvan. Accordingly, plaintiff asserts that it is highly disputed that Galvan made any recommendation to anyone in regard to plaintiff's termination.

Defendants assert that based upon Galvan's recommendation, Hafer retrieved plaintiff's personnel file and saw that seven months earlier she had been warned that "any further instances of any insubordination, failure to put our customers first or displaying further anger management [sic] with customers, employees or referral sources may result in disciplinary action, up to and including termination." Again, plaintiff argues that Galvan's participation in the discussion on plaintiff's termination is directly contradicted by the previous sworn testimony of Bowman and Halas. Plaintiff states that the "revelation" defendants speak of is tantamount to an admission that defendants were looking for any excuse to fire plaintiff.

Further, no matter what level an allegation of sexual harassment, discrimination, or hostile work environment is reported at Enterprise, the expectation is that someone in Human Resources should be brought into the situation to investigate the matter. Bowman states that Halas, Stapleton, Lowe and/or Frana should all have contacted Human Resources regarding plaintiff's complaints. No one in Human Resources was brought in to look at plaintiff's allegations during plaintiff's employment and through her termination. Hafer decided that there was no need to have a Human Resources representative at the second September 29,

2004 meeting, despite plaintiff's specific request for Human Resource involvement.

Plaintiff also asserts that Frana told her that Enterprise does not want employees who "yell sexual harassment." Frana suggested that she did not want to be "that kind of girl," and that she should just "drop it." Further, Jeff Cross ("Cross"), plaintiff's manager at Greenville before Frana, threatened plaintiff that if anyone ever reported sexual harassment, then "we would all go down for it." After plaintiff reported sexual harassment and hostile work environment to Frana, he treated her differently, accused her of being "abrasive," and told her to stop being "so defensive." Frana also told plaintiff there was a "good ole boy" network in place at Enterprise thereby implying that there could be an adverse employment action if she did not go along with certain workplace conduct, which she had complained about to him.

As to plaintiff's work performance, plaintiff points out that on July 20, 2004 (approximately 70 days prior to her firing), plaintiff received a performance evaluation for her work for the previous 12 months. In the category of "Sales and Marketing Effectiveness," plaintiff received an "Exceeds Requirements" score for both car dealerships and body/repair shops. In the category of "Maintains good attitude and disposition, and is cooperative and sincere with employees and customers," plaintiff received a "Meets Requirements" score. In approximately 40 areas of evaluation, Eppes met or exceeded the requirements of her job in all but one area, which dealt with not selling enough "supplemental liability protection" or,

add-on insurance, to customers. Further, sometime in August or September of 2004, Stapleton told plaintiff that she was on the right track to promotion.

## II.     Law Applicable to Rule 56 of the Federal Rules of Civil Procedure

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted by a court only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists. A court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.,* 105 F.3d 279, 280-81 (6th Cir.1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987).

Once the moving party presents evidence sufficient to support a motion under Rule 56 of the Federal Rules of Civil Procedure, the nonmoving party is not entitled to a trial simply on the basis of allegations. The non-moving party is required to come forward with some significant probative evidence, which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex,* 477 U.S. at 323; *Collyer v. Darling,* 98 F.3d 220

14

(6th Cir.1996).

### III.   **Motion for Summary Judgment and Applicable Law**

A.   Retaliation

1.   Title VII and THRA[3]

To establish a prima facie case of retaliation, the plaintiff must prove: 1) he engaged in protected activity; 2) the exercise of protected rights was known to the defendant; 3) that the defendant then took an adverse employment action against plaintiff or plaintiff was subject to severe and pervasive retaliatory harassment; and 4) a casual connection existed between the protected activity and the adverse employment action or retaliatory harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000); *Lentz v. City of Cleveland*, 410 F.Supp.2d 673, 691 (N.D. Ohio 2006). The burden upon the plaintiff to establish a prima facie case of retaliation is minimal and easily met. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997) (citing *Wrenn v. Gould*, 808 F2d 493, 500 (6th Cir.1987)).

---

[3]Retaliation claims under the THRA are analyzed similarly to Title VII cases. *See Bruce v. Western Auto Supply Co.,* 669 S.W.2d 95, 97 (Tenn.App. 1984) (stating that federal law interpreting Title VII is controlling for purposes of interpreting the THRA); *Tetro v. Elliot Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc.*, 173 F.3d 988, 993 (6th Cir. 1999) (stating that the "Tennessee Supreme Court has held that THRA claims are analyzed in the same manner as Title VII claims"). For the sake of simplicity, the Court will only refer to Title VII when discussing its analysis of plaintiff's claims under Title VII and the THRA in this section.

In the instant matter, there is no dispute as to any of the elements with the exception of establishing a causal connection between the protected activity and the adverse employment action or retaliatory harassment. To establish a causal connection, a plaintiff must provide evidence to raise a sufficient inference that the protected activity was the likely reason for the adverse employment action. *Avery Dennison*, 104 F.3d at 861. The defendants repeatedly argues that temporal proximity alone is insufficient to establish an inference of retaliation. There appears to be some confusion in the case law on this issue. The Court in *Nguyen v. City of Cleveland*, 229 F.3d 559, 565-67 (6th Cir.2000) found that temporal proximity alone is generally insufficient to raise an inference of retaliation. Likewise, the Court in *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986) held that temporal proximity alone (4 months) is insufficient to raise an inference of retaliation. However, the Court in *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) found that temporal proximity alone (21 days) is sufficient to establish an inference of retaliation, and the Court in *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir.2004), held that temporal proximity alone (3 months) is sufficient to establish an inference of retaliation. Further, a recent Sixth Circuit case, *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) found that a temporal proximity of two months was sufficient to establish a link between the protected activity and termination for the purposes of setting forth a prima facie case. While it does appear that the Sixth Circuit finds that anything over six months is generally insufficient, standing alone, to establish a causal connection, *See Sanchez v. Caldera*, 36 Fed.Appx. 844, 846 (6th Cir.2002) (citing *Nguyen*, 229 F.3d at 566-67); *Parnell v. West*, 114 F.3d 1188,

1997 WL 271751, **2-3, 1997 U.S.App. LEXIS 12023, *7 (6th Cir. May 21, 1997), the time frame in the subject case appears to be under 23 days, and notably, the plaintiff was dismissed from her employment the day after her meeting with defendants where the parties discussed the complaints of sexual harassment, a hostile work environment, and retaliatino.  However, the Court does not alone rely on temporal proximity, but also relies on the reasons discussed more fully below in support of a pretext to defendants' legitimate discriminatory reason.  Accordingly, the Court deems plaintiff successful in establish her prima facie case.

Once a prima facie case is established, the burden of production shifts to the defendant to provide some legitimate, non-discriminatory reason for his conduct. *Carter v. University of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003).  In the instant matter, the defendants state that plaintiff's poor work performance motivated her dismissal.  The ultimate burden of persuasion rests with the plaintiff to show that any legitimate, non-discriminatory reason is pretextual by establishing that the proffered reason (1) has no basis in fact; (2) did not actually motivate the challenged conduct; or (3) is insufficient to explain the challenged conduct.  *See id.*  The first type of pretextual showing has been described as "easily recognizable" and consists of evidence that the proffered bases for the adverse employment action never happened.  *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994).  The third type of pretextual showing has also been characterized as "easily recognizable" and usually consists of evidence that other employees, especially those outside of the protected class, engaged in the same conduct as that

of the plaintiff, but suffered no adverse employment action. *Id.* These two types of showings constitute direct attacks upon the credibility of a defendants' nondiscriminatory reasons for its action and, if successful, can provide the evidentiary basis for the "suspicion of mendacity" described by the Supreme Court in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 (1993). *Id.*

In the second type of pretextual showing, a plaintiff admits the factual basis of the defendant's articulated reasons and admits that such conduct could warrant the adverse employment action. *Id.* However, the plaintiff argues that the weight of the circumstantial evidence makes it "more likely than not" that the employer's explanation is a pretext for discrimination. *Id.*

While the issue of pretext is not clear-cut, the Court disagrees with the defendants and finds that under summary judgment standards, there was sufficient evidence to show pretext. First, the Court notes that after the plaintiff gave notice of sexual harassment and a hostile work environment, defendants' conduct toward plaintiff changed in that defendants were focused on creating a record of plaintiff's misconduct. Second, defendants' conduct with respect to handling plaintiff's complaint is suspect. Plaintiff asserts that she reported a case of sexual harassment and retaliation to the defendants. The defendants did not include Human Resources in the meeting regarding plaintiff's complaint. Further, it appears that the plaintiff's complaints were not reported to Human Resource personnel when discussing whether to terminate plaintiff's employment. The plaintiff paints a picture

of repeated inaction by defendants with respect to her complaints.

Third, co-workers advised plaintiff not to report allegations of sexual harassment and hostile work environment and also made statements indicating that the company does not work with a victim employee in these types of situations. In *Asmo*, the Court stated that while a co-worker may not have direct or indirect influence on termination,

> this court has held that "[a]lthough discriminatory statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination, the comments of a nondecisionmaker are not categorically excludable. Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Id.* at 356 (citations omitted).

*Asmo*, 471 F.3d at 595 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998)). Fourth, it is suspicious that Galvon's involvement in the decision to terminate the plaintiff was not expressed or discussed during the unemployment hearing in November of 2004. Without more information and viewing the facts favorably for the plaintiff, a jury may assume that a new justification or additional rationale is suspect, that is, once the lawsuit was filed and the defendants knew that the reasons for termination would be subject to scrutiny, the defendants added or changed justifications with respect to the plaintiff's termination. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir.1996), *amended on other grounds*, 97 F.3d 833 (6th Cir.1996) (order); *Asmo*,

471 F.3d at 596.

Fifth, the Court finds peculiar that plaintiff's sexual harassment and hostile work environment complaint was discussed only after defendants discussed plaintiff's performance issues. As stated above, plaintiff was unaware that such performance issues would be discussed. A jury could find that the performance meeting was planned to head off plaintiff's complaint. Sixth, since defendants first decided that plaintiff should be transferred but later decided that plaintiff should be fired, a jury could find that the defendants had originally felt that a transfer was in order before the meeting was held, but that after hearing plaintiff's extensive complaints against the company and its employees at the meeting, the defendants decided to rid themselves of plaintiff, who brought the company human resource problems and legal problems arising from discrimination and retaliation claims. Seventh, the plaintiff claims that she was told by Halas at the September 29th meeting that she was on track for promotion and that he had always felt she was a stellar employee. This inconsistent act is in line with the above reasons for pretext.[4]

The Court is certainly aware that defendants may be successful at trial when the credibility of the parties is evaluated. There are certainly facts in which a jury could find for the defendants. However, the Court finds that whether the defendants had a legitimate and nondiscriminatory reason for dismissing plaintiff or whether

---

[4]Although the plaintiff has put forth additional reasons evidencing pretext, the Court need not articulate additional rationale.

defendants terminated her for an improper reason is an issue for jury determination. At this juncture in the proceedings, the plaintiff has presented more than a scintilla of evidence to support each element of her claim and there are genuine issues as to material facts in dispute in this matter. *Street v. J.C. Bradford Co.*, 886 F.2d 1472 (6th Cir. 1989); *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991); *White v. Federal Exp. Corp.*, 729 F.Supp. 1536, 1533 (E.D. Va. 1990). Accordingly, summary judgment is not appropriate in that the plaintiff has sufficiently set forth a prima facie case of retaliation under Title VII, as well as demonstrated that the defendants reasons for firing her establish a genuine issue of fact. Courts have cautioned against granting motions for summary judgment in cases where motive and causation are at issue. *Strickland v. MICA Info. Sys.*, 800 F.Supp. 1320, 1324 (M.D.N.C. 1992) (*citing Herold v. Hajoca*, 864 F.2d 317, 319 (4th Cir. 1988) *cert. denied*, 490 U.S. 1107 (1989). Consequently, defendants' motion for summary judgment as to plaintiff's claim of retaliation in violation of Title VII are denied.

## 2. State law retaliatory discharge

Plaintiff also makes a claim under the TPPA, as well as asserts a companion claim of retaliatory discharge under Tennessee common law. The two causes of action are very similar in many respects; however, they are not identical and must be analyzed separately.

To establish a claim for retaliatory discharge under the TPPA, plaintiff must

show (1) her status as an employee of Enterprise; (2) her refusal to participate in, or remain silent about, illegal activities; (3) her termination; and (4) an exclusive causal relationship between her refusal to participate in or remain silent about illegal activities and her termination by Enterprise. *Anderson v. Standard Register Co.,* 857 S.W.2d 555, 558 (Tenn. 1993). In the common law cause of action for retaliatory discharge, the plaintiff must show that (1) an employment-at-will relationship existed; (2) she was discharged; (3) the reason for her discharge was that she attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in Enterprise's decision to discharge her was her exercise of protected rights or compliance with clear public policy. *Crews v. Buckman Laboratories Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn.2002); s*ee also Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 535 (Tenn.2002); *Mason v. Seaton*, 942 S.W.2d 470, 474 (Tenn.1997); *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn.1997); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 899 (Tenn.1992); *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 556 (Tenn.1988); *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 444-45 (Tenn.1984).

The Court notes that under TPPA, the plaintiff must sufficiently allege an exclusive causal relationship, while under Tennessee common law, the plaintiff need only show that her exercise of protected rights was a "substantial factor" in her firing. In light of the facts and reason stated above, plaintiff has offered sufficient evidence

of a causal link in this case and has presented "more than a scintilla of evidence" to create a genuine issue of material fact as to whether her dismissal was in retaliation for exercising her protected rights in violation of both the TPPA and Tennessee common law.

### B. Aiding and abetting unlawful activity under THRA

Under the THRA, it is a discriminatory practice for a person or for two (2) or more persons to aid, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory. T.C.A. § 4-21-301(2). The plaintiff alleges that Halas, Stapleton, and Lowe aided, abetted, incited, compelled, or commanded Enterprise to engage in discriminatory acts. Unfortunately, the THRA does not define "aiding and abetting;" however, district courts, looking to the Tennessee Supreme Court, have referred to the analogous theory under the common law, requiring that the individual defendant (1) know that the employer's conduct constituted a breach of duty and (2) give substantial assistance or encouragement to the employer in its discriminatory acts. *Jenkins v. Nashville Pub. Radio*, No. 3:02CV109, 2005 WL 3358871, at *7 (M.D.Tenn. Dec. 9, 2005) (citing *Carr v. United Parcel Serv., 955 S.W.2d 832, 835 (Tenn.1997), overruled on other grounds).*

Upon examination of Sixth Circuit case law, a supervisor who is merely acting in fulfillment of his duties cannot be held individually liable for discrimination under

the THRA. *See Crutchfield v. Aerospace Ctr. Support*, No. 98-6105, 1999 WL 1252899, at *2 (6th Cir. Dec. 14, 1999) (affirming a district court's grant of summary judgment in favor of an individual defendant on a THRA claim when the defendant's actions adverse to the plaintiff's employment all were within the legitimate scope of the defendant's delegated management authority); *see also Jenkins*, 2005 WL 3358871, at *7 (finding that a supervisor did not aid or abet discriminatory acts taken against a plaintiff when he made the decision not to promote her).

It appears that individual liability under the THRA requires an act that is "separate and distinct from acting as a supervisor." *See* Colette Koby & Tara Fergus, *How to Keep Supervisors from Being Held Individually Liable for Discrimination or Sexual Harassment*, 42-JUL Tenn. B.J. 20 (2006); *see also Hood v. Tenn. Bd. of Regents*, No. 3-04-0473, 2006 WL 2645197, at *10-11 (M.D.Tenn.2006) (denying summary judgment for individual defendants where they prevented action that could have corrected discriminatory behavior); *Harris v. Dalton*, No. E2000-02115-COA-R3-CV, 2001 WL 422964, at *3-4 (Tenn.Ct.App. Apr. 26, 2001) (finding that a supervisor could be held individually liable for discrimination where he thwarted his employer's investigation into his improper behavior). For liability to be imposed, the distinct conduct must aid or abet discrimination by the employer. *Carr*, 955 S.W.2d at 836, 838.

Plaintiff has alleged that Halas and Stapleton had the power to correct the sexual harassment situation as well as the situation of retaliation, but chose, not only

to abdicate their responsibility for correction, but to participate in forcing plaintiff from her employment. Plaintiff states that in addition to recommending termination, Halas and Stapleton also instructed Frana to create documentation against her, create unsigned documentation to "backload" her file, hold a disciplinary meeting with her prior to the meeting with Lowe in order to intimidate her, and sought out detrimental information about her from third parties in order to attempt to justify her firing. Plaintiff feels that Halas and Stapleton failed to take any corrective action in response to her sexual harassment and hostile work environment claim, as well as the retaliation complaint, in that there were no disciplinary meetings nor memos to either Frana or Lowe. Further, plaintiff indicates that the disappearance of two crucial pieces of evidence, an e-mail from plaintiff to Halas evincing the protected activity and her journal, are suspect. A combination of the above supports the basis that a jury should determine whether Halas and Stapleton aided, abetted, incited, compelled, or commanded Enterprise to engage in discriminatory acts.

As to Lowe, plaintiff asserts that Lowe incited Enterprise in unlawful retaliation against Eppes when he participated in the September 29th meeting and continued to lie about his past behavior. Plaintiff states that Lowe stonewalled plaintiff's complaints when he refused to be truthful about his undermining of plaintiff, his false rumors about plaintiff, and his actions in other childish acts against her in the workplace. Plaintiff asserts that Lowe purposefully prevented Enterprise from taking corrective action in deterring the investigation. The plaintiff has presented sufficient proof that Lowe "knew that [Enterprise's] conduct constituted a breach of duty" and

that he "gave substantial assistance or encouragement to" Enterprise. See *Carr*, 955 S.W.2d at 836 (stating that, although a non-supervisor will rarely possess the ability to prevent an employer from taking remedial action, the non-supervisor should be liable for conduct which encourages or prevents an employer form taking remedial action.).

## IV.    CONCLUSION

For the reasons hereinabove set forth, defendants' motion for summary judgement [Doc. 78] is **DENIED in its entirety**. Furthermore, plaintiff's motion to strike part of defendants' reply to plaintiff's response to defendants motion for summary judgment [Doc. 109] and plaintiff's motion for clarification of the Court's scheduling order regarding summary judgment and, if deemed appropriate, for ancillary relief [Doc. 110] are **DENIED as moot**.

**IT IS SO ORDERED.**

**ENTER:**

s/Thomas W. Phillips
UNITED STATES DISTRICT JUDGE

.